Reese, J.
delivered the opinion of the court.
In the year 1838, the plaintiff in error sold a tract of land to one I. B. Butcher. In security for the consideration, the said Butcher gave to the plaintiff in error two several bills single of the same date and tenor, each for the sum of two hundred dollars, payable to the said plaintiff in error, in the May of the following year, to each of which, Peter Sharp & Co. affixed their signature, without their seal, as sureties. These instruments were written upon the sanie piece of paper, and delivered to the plaintiff, and by him taken into his possession.
In the course of the following year, 1839, Butcher, who was a “steam doctor,” claimed to have rendered, and did render, to the plaintiff in error himself, and a servant of his, medical services in that line. His claim for these services not having been paid, as he alledged, he brought suit before a Justice of the Peace against the plaintiff in error, to recover their value. On the trial the plaintiff in error alledged that he had paid for them; but this not appearing in proof, the Justice rendered a judgment against the plaintiff in error for the sum of one hundred dollars. It may be remarked, that the whole proceeding was coram non jndice, and merely void; the Justice having no jurisdiction, upon a claim so evidenced, to render a judgment *87 for more than fifty dollars. The plaintiff in error, however, on other grounds, protested at the time against the justice of judgment; yet throwing upon the table, before the Justice, the piece of paper on which were written the two instruments here-inbefore described, he directed the Justice to endorse a credit thereon for one hundred dollars, the amount of the pretended judgment. The Justice did so; and placed the endorsement, locally, upon the blank space between the two instruments. The plaintiff in error, at some subsequent period, separated the two instruments by removing the blank paper between them, in which process the credit endorsed by the direction of the plaintiff in error entirely disappeared. Subsequently I. B. Butcher departed this life, and one Allen Hurst became his administrator, and filed a bill in Chance'ry at Tazewell, to ascertain the extent of indebtedness of the estate, and to marshal the assets in a pro rata payment of the same, and an account was ordered accordingly.
In taking the account before the Clerk and Master, the plaintiff in error although named as a party defendant in the bill presented no vouchers or evidences of claims against the estate, relying, as he said, upon the liability and solvency of Peter Sharp & Co., and, therefore, on motion of the complainant, the Clerk and Master issued a subpcena duces tecum, and the two-bills single were produced, and the Clerk and Master imposed an oath upon the plaintiff in error, and he swore, as the record of the Clerk and Master sets forth, “that the amount of said notes was yet due and unpaid, and that he had not received anything in payment of the said notes, or any part thereof.”
Upon this statement is the perjury charged in the bill of indictment assigned. The bill of indictment is not so framed as to set forth at large the bill in Chancery, and other judicial proceedings connected therewith and consequent thereon, so as in that way to manifest the import and materiality of the oath of the plaintiff in error, which occurred in the course of, and as a part of those proceedings; but to manifest the import and materiality of such oath, it is framed as indictments for perjury have been framed in England, since the act 23 Geo. 2, and in N. Carolina, since the act of 1791, by virtue of the provi *88 sions and purview of those acts; namely, by description and averment of so much of the nature and substance of those proceedings as it was supposed would make distinctly manifest the import and the materiality of the oath which was taken. And this is supposed to be erroneous, and is the first error assigned in argument by the counsel of the plaintiff.
It is insisted, that the first mode is the common law mode in force and use in England until the 23 Geo. 2, and in North Carolina until the act of 1791; that those statutes are not in force here, and that, therefore, the original common law form of framing an indictment for perjury, must continue to be the only legal and proper form with us, until the intervention of the legislature shall produce a statutory change. On the other-hand it is said, that forms of judicial proceedings, whether in civil or criminal cases, have at no time, in point" of fact, arisen, and from their objects and nature could scarcely arise in legislative sanction; but that they were enacted by the courts, and must, by the courts from time to timé, be so changed, modified and applied, as to subserve the safety of the citizen and the ends of public justice, in the convenient and intelligible transaction and despatch of public business; that the intention of the legislature in this very instance, to correct a great evil and furnish a salutary change in the forms of judicial proceedings, resulted from no want of power in the courts to have made the change themselves, but because, in their somewhat unreasonable and too tenacious adherence to ancient forms and precedents, they neglected or refused to do so. It is insisted that, at the very foundation of our State government, our courts, in the exercise of a legislative power inherent in the nature of their functions, adopted and introduced the improved forms in indictments for perjury, which arose from the statutes of Geo. 2, and of N. Carolina, and which have been used, sanctioned and enforced ever since, now nearly fifty years; and that if, originally, the power of our courts, to have adopted these forms without the intervention of the legislature, were questionable, still, at this day, we must adhere to the usages and forms established, and cannot be drawn back to forms, inconvenient, if not impracticable and absurd, and now obsolete in England, *89 and never in use and force here; and of this opinion are the court. But the question is the less material in this case, because of our opinion on other points.
When the instruments in question were produced by the prisoner before the Clerk and Master as evidences of claim against the estate of Butcher, in obedience to the subpoena, duces tecum, he had nothing more to do, on his part, if the genuineness of the instruments were admitted. If that were questioned, he could not establish their execution and validity by his oath; that must have been done by the attesting witness, if such there were, and if not, by proof of the hand writing of the makers according to la)fV. In all this, the oath of the payee or claimant could not be taken, or his testimony be heard. But the vouchers being genuine, the laboring ore was thrown into the hands of the other party; what payments had been made? What set-off existed? If any were alledged, it was for the representative of Butcher to show by the production of receipts and by the proof of payment or of set-off. In all this, the oath of the prisoner was out of the question. If the statute of limitations had appeared to bar the claim, and had been insisted on by the other side, as well might the Clerk and Master, at the instance of the prisoner, have enquired of the representative of Butcher, upon his oath, whether he or his intestate had made no promise or acknowledgement that would take the case out of the statute. This summary inquisition, by means of the oath of the other party, breaks down all the well considered and long settled rules of law, and is, in the utmost degree, perilous tothe consciences of our citizens. The oath in this case was extrajudicial. If the Clerk and Master may be supposed, in taking an account under such circumstances, to be clothed with all the power of the Chancellor, when proceeding by bill of discovery, the casus for the exercise of such a jurisdiction did not exist. For the record shows that the circumstances of the trial before the Magistrate, and the medical services of Butcher, such as they were, were known to many persons, and in this very case, proved by many persons.
Again: if the Clerk and Master had possessed the power, under the circumstances, and for the end in view, to have ad *90 ministered the oath to the prisoner, and to have questioned him on the subject, still he did not so frame his interrogatories as to induce an answer false in the legal or ordinary sense of its terms; the prisoner swore only that the notes were unpaid, and that he had received nothing in payment. This does not negative the existence or the justice of the set-off for medical services, or the fact of the credit as entered by the Justice; that endorsement was not a payment, but the evidence merely of payment. It is true, indeed, that a man, careful of conscience and character when thus interrogated, would not place himself within the narrow and painful limits of mere literal truth, still if this be done, it does not constitute a proper case for the assignment of peijurjn
The opinions by us entertained upon these two last points, go to the foundation of this prosecution, and supersede the necessity of looking into the charge of the court, and considering what portion of that, if any, may have been erroneous, and, also, whether the alledged variance between the record of the Clerk and Master, as to the description of the notes or instruments, and the description of them in the indictment, be material and important.
The judgment of the Circuit Court, upon the whole matter, will be reversed, and the prisoner be discharged.